UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **ASSET MANAGEMENT GROUP, LLC and NEW DETROIT PROPERTY, LLC,** | **2:23-CV-11496-TGB-KGA** |
| Plaintiffs/Counter-Defendants, | HON. TERRENCE G. BERG |
| vs. | **ORDER GRANTING DEFENDANT CITY OF DETROIT'S MOTION (1) FOR SUMMARY JUDGMENT DISMISSING PLAINTIFFS' COMPLAINT AND (2) FOR SUMMARY JUDGMENT ON THE CITY'S COUNTERCLAIMS (ECF NO. 16)** |
| **CITY OF DETROIT,** | |
| Defendant/Counter-Plaintiff. | |

Acting under its emergency demolition ordinance, the City of Detroit tore down two abandoned buildings that represented an immediate danger to the public. The owners of these two properties—Plaintiff New Detroit Property, LLC (the "Robson Property"), and Plaintiff Asset Management Group, LLC (the "McNichols Property") now complain that their destruction amounts to a "taking" without just compensation, or an "inverse condemnation" under the United States and Michigan Constitutions, and that they are entitled to compensation for the loss of the structures on their two properties. Defendant City of Detroit has filed a counterclaim against both Plaintiffs seeking to recover the costs it expended to demolish each of the buildings.

1

Now before the Court is Defendant City of Detroit's Motion (1) for Summary Judgment Dismissing Plaintiffs' Complaint and (2) for Summary Judgment on the City's Counterclaims. ECF No. 16. The motion has been fully briefed. Upon review of the parties' filings, the Court concludes oral argument will not aid in the resolution of this matter. Accordingly, the Court will resolve the present motion on the briefs. *See* E.D. Mich. L.R. 7.1(f)(2).

For the reasons stated below, the City's motion (1) for summary judgment on Plaintiffs' Complaint and (2) for summary judgment on the City's counterclaims will be **GRANTED**.

## I.   BACKGROUND

### A. Factual Background

#### 1. Relevant Detroit City Code Provisions

The City of Detroit can seek to demolish buildings in two different ways under the Detroit City Code of Ordinances (hereinafter the "City Code").[1] The first way the City can seek to demolish a building is under Chapter 8, Article XVII, Divisions 1-3 the Detroit City Code, which relates to administration and enforcement of buildings or structures in the City that are deemed to be "dangerous buildings." *See* §§ 8-17-1, 8-17-2 (defining "Dangerous building" broadly to include buildings

---

[1] A copy of the Detroit City Code can be found at https://library.municode.com/mi/detroit/codes/code_of_ordinances?nodeId=n2019DECO [https://perma.cc/7827-WRPR].

damaged by fire, wind, deterioration, etc., buildings that are vacant or dilapidated, or open to the elements, or buildings that are unoccupied for at least 180 days, among other things). Because dangerous buildings pose a less imminent danger of harm than buildings subject to emergency demolition procedures, discussed next, the City Code prescribes certain notice and procedural enforcement requirements in the case of dangerous buildings.

The City may issue blight violation notices for maintaining an "dangerous building" in violation of the City Code that could subject property owners to civil fines. §§ 8-17-11, 8-17-12. And, in the case of a finding by an inspector that a certain property is a "dangerous building" under Section 8-17-21, the Code provides for written notice of that finding to any owner and "party-in-interest" in the property specifying the time and place for that person to appear and show cause before a hearing officer why the building or structure should not be demolished. §§ 8-17-21 to 8-17-23. If that person does not appear or refuses to comply with the hearing officer's order, a notice is issued for a show cause hearing to be held before the Detroit City Council to determine whether the property should be demolished. §§ 8-17-24 to 8-17-25. Upon a finding that a property should be demolished, a party may file a request for a demolition deferral, § 8-17-26, or appeal the City Council's decision to the circuit court. § 8-17-25(e). If the City Council adopts the resolution to demolish the building, and the building is subsequently demolished, the City can

3

recover the costs incurred to demolish the building or structure. § 8-17-27.

The second way the City can seek to demolish a building is under the "Emergency" demolition provisions in Chapter 8, Division 4 of the City Code, entitled "DIVISION 4. - EMERGENCY ENFORCEMENT BY BUILDING OFFICIAL AND CITY DEPARTMENTS." §§ 8-17-41 to 8-17-45. Section 8-17-41 of the Detroit City Code provides:

**Vacation of buildings and structures; posting of notice**

When, in the opinion of the Building Official, there is actual and immediate danger of failure or collapse of a building or structure, or any part thereof, which would endanger life, or when any structure or part of a structure has fallen and life is endangered by the occupation of the building or structure, the Building Official is hereby authorized to order and require the occupants to vacate the same forthwith. The Building Official shall post, or cause to be posted, at each entrance to such building a notice to read as follows:

NOTICE
UNSAFE BUILDING (OR STRUCTURE)
ENTRY PROHIBITED — STAY OUT

"This building (or structure) is unsafe and, therefore, its use or occupancy is prohibited by the Building Official and is under police protection. All persons are hereby ordered to stay out of this building (or structure). It is unlawful under Section 31-4-1(a) of the 2019 Detroit City Code for any person to enter this building (or structure) without express written authorization, or under Section 31-4-2(b) of the 2019 Detroit City Code to destroy, mutilate, deface or remove this Notice. Any person who enters this building (or structure) without

4

express written authorization, or destroys, mutilates, defaces or removes this Notice is subject, under Section 31-1-1 of the 2019 Detroit City Code, to conviction of a misdemeanor, which will result in a fine of up to $500.00, a sentence of up to 90 days in jail, or both, in the discretion of the court."

Section 8-17-42 of the Detroit City Code then provides:

**Abatement of condition**

When, in the opinion of the Building Official, there is actual and immediate danger of collapse or failure of a building or structure or any part thereof or where such other conditions exist which would endanger life, or constitute a hazard to the public, he or she shall cause the necessary work to be done to abate the condition, *whether or not the procedures that are contained in Division III of this article, Enforcement Through Show Cause Hearings at Buildings, Safety Engineering, and Environmental Department and at City Council, have been commenced.*

(emphasis added). Thus, while Section 8-17-41 requires that a building subject to an emergency demolition be posted with a notice to "STAY OUT," because the Building Official has determined that there is "actual and immediate danger of failure or collapse" of the building or structure that would "endanger life," neither Sections 8-17-41 nor 8-17-42 require the City to mail property owners or other interested parties notice that the building is to be demolished, or to post such a notice on the building before the emergency demolition.

Accordingly, Section 8-17-44 of the Detroit City Code provides:

**Emergency Work.**

For the purposes of this division, the Building Official shall employ necessary labor and materials to perform the required emergency work *as expeditiously as possible to protect the public health, safety, and welfare.*

(emphasis added).

And, Section 8-17-45 of the Detroit City Code then provides:

**Payment and recovery of cost for emergency work; unpaid costs to result in liens.**

Where any cost incurred by the City in the performance of emergency work is paid by the City upon approval of the Building Official, the Law Department shall institute appropriate legal action against all owners of the building or structure for the recovery of such cost.

### 2. The Robson Property

Plaintiff New Detroit Property, LLC ("New Detroit") holds legal title to property located at 13927 Robson in the City of Detroit (the "Robson Property"). Deed, ECF No. 8-5; Taxpayer Record, ECF No. 8-6. On or about January 22, 2021, the Robson Property suffered a fire which caused extensive damage to the house. First Amended Complaint ("FAC") ¶ 14, ECF No. 6; Photographs, ECF No. 16-2.

Shortly after the fire, on or about January 25, 2021, employees from the City of Detroit's Buildings, Safety Engineering and Environmental Department ("BSEED") inspected the Robson Property and determined that the remainder of the house was structurally unsound and unsafe,

and was in immediate danger of collapse, posing an imminent threat to the health, safety and welfare of the public. Photographs, ECF No. 16-2; Report, ECF No. 16-3. The photographs, below, show that the second and third floors had collapsed into the first floor, leaving precarious, unsupported exterior walls.





BSEED determined that an emergency demolition was necessary to safeguard the public. Report, ECF No. 16-3.

Accordingly, in compliance with Section 8-17-41 of the Detroit City Code, the inspector posted the building with a "STAY OUT" notice. And, based on his January 25, 2021 inspection, the BSEED inspector recommended that the Robson Property be immediately demolished pursuant to Section 8-17-42 of the Detroit City Code as an emergency measure. *Id.* The recommendation was forwarded to the Building Official, David Bell, who also agreed.

BSEED prepared a "Notice of Emergency Ordered Demolition" on or about January 27, 2021. Notice, ECF No. 16-4. Although the Detroit City Code did not require written notice in the case of an emergency demolition, BSEED also mailed this notice to New Detroit, which was listed in the Wayne County Register of Deeds as the owner of the Robson Property, ECF No. 8-5, and which was also listed as the taxpayer of record for the Property. ECF No. 8-6.

Pursuant to Section 8-17-44, the City retained Inner City Contracting ("ICC") to perform the emergency demolition. Permit, ECF No. 16-5. Shortly thereafter, ICC demolished the Robson Property. ICC charged the City $14,900 to complete the demolition. ECF No. 16-6.

### 3. The McNichols Property

The property located at 16926 West McNichols consisted of four small contiguous commercial buildings. Photograph, ECF No. 16-19. This lawsuit involves only the westernmost building, located at the corner of

8

West McNichols and Biltmore, which was sometimes known by an alternate address, 16940 West McNichols (the "McNichols Property").

In January 2017, Plaintiff, Asset Management, entered into a Land Contract with Lewis and Tangela Broomfield and Caribbean and African Tropical Food Store to purchase all four commercial buildings and a large vacant lot located at 16926 West McNichols for $65,000. Land Contract, ECF No. 16-7. Asset Management took control of the property, but the Broomfields continued to be the legal owners of the property. Declaration of Dwight Dobbins ¶ 5, ECF No. 17-2, PageID.301. Asset Management rented the habitable buildings to tenants, but, according to Asset Management, the westernmost building, the McNichols Property, needed approximately $44,935 in repairs to be habitable. *Id.* ¶¶ 6–7.

The City issued several Correction Orders and multiple blight tickets regarding the McNichols Property starting in 2018 and extending through May of 2019. ECF Nos. 16-8, 16-9. The Corrections Orders, issued on March 14, 2019, March 29, 2019, and May 7, 2019, noted the "[f]ailure to maintain vacant building or structure in accordance with the applicable requirements of Section 9-1-113" and numerous other violations. ECF No. 16-8. The Correction Orders and blight tickets were mailed to Asset Management at the 16926 West McNichols, Detroit, Michigan 48325 address. ECF Nos. 16-8, 16-9. That was Asset Management's mailing address both on the land contract, ECF No. 16-7, and on the Taxpayer Record for the McNichols Property. ECF No. 16-10.

The City asserts nothing was done in response to these orders and tickets.

In 2018 and 2019, BSEED also instituted "non-emergency" dangerous buildings proceedings requesting City Council authorization for the demolition of the McNichols Property. As noted above, "non-emergency" dangerous building proceedings under Chapter 8, Article XVII, Divisions 1–3, involve a more time-consuming process than emergency demolition proceedings under Chapter 8, Article XVII, Division 4. To recap, under Divisions 1 to 3, BSEED first sends the owner of the property notice of an "office hearing" with BSEED to contest BSEED's desire to demolish the building. If the owner does not show up or shows up but BSEED nevertheless determines that demolition is appropriate, the owner is sent further notice that a show cause hearing will be held by the Detroit City Council to determine if the building should be demolished. If the City Council determines the building should be demolished, the owner can file a demolition deferral request or appeal the City Council's determination to the circuit court. If the City demolishes the property, it may seek reimbursement for the costs of demolition.

In this case, BSEED's "Tidemark" computer report shows that an investigator determined that the McNichols Property was a dangerous property and BSEED mailed Asset Management notice of an "office hearing" which was held in BSEED's offices on or about October 29, 2018.

ECF No. 16-11. The notice was sent to Asset Management at the address shown on the relevant tax assessment records and registrar of deeds. The City does not believe that Asset Management appeared at the office hearing (and Asset Management does not state that it did) and BSEED requested that City Council approve the demolition. *Id.*

On or about February 1, 2019, the Detroit City Clerk mailed a notice to Asset Management that the hearing officer concurred with the recommendation that the McNichols Property be demolished and that a show cause hearing would be held before the City Council on February 18, 2019 to determine if the McNichols Property should be demolished. ECF No. 16-12. The notice instructed Asset Management to "be present to show cause why said structure(s) should not be ordered demolished or otherwise made safe." *Id.* This notice was sent by certified mail to Asset Management at the 16926 W. McNichols address listed on the land contract and taxpayer record for the McNichols Property. *Id.* The certified mail was returned as undeliverable. *Id.*

On February 18, 2019, the City Council authorized the demolition of the McNichols Property. And on March 28, 2019, the City mailed a notice to Asset Management that the City Council had ordered the McNichols Property demolished. ECF No. 16-13. As before, this notice was sent by certified mail to Asset Management at the 16926 W. McNichols address listed on the land contract and taxpayer record for the McNichols Property. *Id.* The certified mail was returned as

11

undeliverable. *Id.* However, the City did not immediately demolish the McNichols Property. The City surmises in its motion that this was most likely due to a shortage of funds.

A year after the City Council had authorized the demolition, on February 3, 2020, a BSEED inspector conducted an "Emergency Re-Inspection" of the McNichols Property and noted that the building was in even worse shape. His report at that time noted:

> Found 1 story, brick, comm bldg. Open to trespass & elements at rear and roof. High weeds & tree growing through roof, causing structural damage and partial roof collapse. Façade masonry has collapsed, debris litters [right-of-way] ROW; subject to further structural collapse. Illegal dumping. **REC: Proceed w/ partial emerg. demo of effected unit.** E-demo notice issued 7/24/14; notice posted 12/2019. Updated notice required.

ECF No. 16-14, PageID.264 (emphasis added).

The inspector took photographs of the Property (see below) showing that the westernmost wall of the building was falling down, with bricks strewn across the adjoining public sidewalk, the roof was open, allowing rain and snow to enter, a large tree was growing through the roof, the door was wide open, allowing trespassers and further exposure to the elements, and the site was littered with trash. *See id.* PageID.260–63.







Based on his February 3, 2020 inspection, the BSEED inspector recommended that the westernmost building, the McNichols Property, be immediately demolished pursuant to Section 8-17-42 of the Detroit City Code as an emergency measure. *Id.* PageID.264. The City states that the recommendation was forwarded to the Building Official, David Bell, who agreed with the recommendation.

As required by Section 8-17-41 of the Detroit City Code, the City posted the McNichols Property with a "STAY OUT" notice. *See id.* PageID.261 (red placard). The City also prepared a "Notice of Emergency Demolition," dated February 4, 2020. And even though the Detroit City Code did not require written notice in the case of an emergency demolition, the City mailed the notice to the legal owner of the McNichols

Property, Lewis Samuel Broomfield. ECF No. 16-15; Deed, ECF No. 8-11. The City did not mail the notice to Asset Management.

Pursuant to Section 8-17-44 of the City Code, the City retained Dore & Associates Contracting ("Dore & Associates") to perform the emergency demolition of the McNichols Property. ECF No. 16-17. Dore & Associates had an authorized "work start date" of February 19, 2019 for the McNichols Property, and a "work completion date" of March 19, 2020. ECF No. 16-18, PageID.275.

According to Plaintiffs, on February 25, 2020, an Asset Management employee, April Coley, notified Dwight Dobbins, a managing member of Asset Management, that she had just driven past the McNichols Property and saw fencing placed around the Property. Dobbins Decl. ¶13, ECF No. 17-2, PageID.302. Dobbins instructed Coley to contact BSEED, which she did. *Id.* ¶ 14. Coley was instructed to go to BSEED and pick up a demolition deferral packet, which she did on February 26, 2020. *Id.* ¶ 15. The next day, on February 27, 2020, Coley told Dobbins that she observed the westernmost building, the McNichols Property, being torn down. *Id.* ¶ 18.

Dore & Associates charged the City $28,800 to complete the demolition of the McNichols Property. ECF No. 16-18, PageID.273.

After the McNichols Property had been demolished, Asset Management obtained title to the Property through a Quit Claim deed recorded on March 11, 2020. ECF No. 16-16.

15

**B. Procedural History**

On May 22, 2023, Asset Management filed this lawsuit in the Wayne County Circuit Court. ECF No. 1, PageID.7–11. The Complaint alleged that Asset Management owned both the Robson Property and the McNichols Property and that the City had demolished both properties without commencing a formal condemnation action or administrative proceeding. ECF No. 1. The Complaint contained two counts, each entitled "Inverse Condemnation," and requested judgment for the loss of the value of the properties, interest, costs and attorney fees under the Taking Clause of the Fifth Amendment to the U.S. Constitution and Article X, Section 2 of the Michigan Constitution of 1963. *Id.*

The City removed this action to this Court on June 23, 2023 based on federal question jurisdiction, ECF No. 1, and on June 30, 2023, the City filed an Answer and Affirmative Defenses. ECF No. 2. The City denied that its demolitions were improper or unlawful, and also noted that Asset Management did not have an ownership interest in the Robson Property. *Id.* The City also filed a Counterclaim to the Complaint to recover the costs it had incurred in demolishing the two Properties. ECF No. 3.

On July 19, 2023, Plaintiffs Asset Management and New Detroit filed a First Amended Complaint for Inverse Condemnation ("FAC"). ECF No. 6. This FAC was essentially the same as the original complaint,

but noted that New Detroit, not Asset Management, owned the Robson Property. ECF No. 6.

The City filed an Answer and Affirmative Defenses to the FAC and an Amended Counterclaim on August 2, 2023. ECF Nos. 7 and 8. The City's Amended Counterclaim contains the following counts: (1) Count I - Recovery of Costs of Emergency Demolition Under City of Detroit Code, Section 8-17-45; (2) Count II - Unjust Enrichment; and (3) Count III – Restitution for Abatement of a Public Nuisance.

The City has now filed the instant Motion (1) for Summary Judgment Dismissing Plaintiffs' Complaint and (2) for Summary Judgment on the City's Counterclaims. ECF No. 16. The City argues that there is no dispute that both Properties were hazardous buildings requiring an emergency demolition, and that under the applicable ordinance the City was not required to provide notice before taking action to protect the public. The City contends that the demolitions complied with both the Detroit City Code and with constitutional standards. Finally, the City argues that because the demolitions were lawful and proper, it is entitled to summary judgment on its counterclaims.

Plaintiffs Asset Management and New Detroit filed a Response in partial opposition to the City's motion. In the response New Detroit withdrew its claims against the City concerning the Robson Property and conceded the City's counterclaim for reimbursement of its demolition costs. However, Asset Management does oppose the City's motion,

arguing that there are material questions of fact as to whether the City legitimately used its police power to abate the alleged nuisance. Asset Management also asserts it did not receive proper notice of the demolition proceedings.

The City filed a reply brief in support of its motion. The City contends that Asset Management had both constructive and actual notice of the City's intention to demolish the McNichols Property, and the City properly demolished the property to abate a nuisance in accordance with the City's Code.

## II.   LEGAL STANDARD

A party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). No genuine material factual dispute exists if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

At summary judgment, the Court construes the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in his favor. *Id.* The nonmoving party's evidence need not be in an admissible form. *Celotex v. Catrett*, 477 U.S. 317, 332 (1986). But he must "show that [he] *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to

demonstrate that a genuine issue on a material fact exists." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (emphases in original).

## III.   DISCUSSION

### A. The Robson Property

As stated, Plaintiff New Detroit Property, LLC does not oppose the City's motion for summary judgment to dismiss its claim against the City and does not oppose the City's counterclaim for the costs of demolition of the Robson Property. Accordingly, the Court **GRANTS** the City's motion for summary judgment as to New Detroit and **DISMISSES** New Detroit's claim against the City. The Court further **GRANTS** the City's counterclaim against New Detroit and orders New Detroit to pay the City **$14,900** to reimburse the City for the costs of demolishing the Robson Property pursuant to the City Code's procedures for emergency demolition.

### B. The McNichols Property
#### 1. Asset Management's Takings/Inverse Condemnation Claim

Plaintiff Asset Management alleges that the City demolished the McNichols Property without any notice to Asset Management and without complying with the required procedures under the City Code, and that the demolition of the Property amounts to an unjust taking in

violation of the United States and Michigan Constitutions.[2] For its part, the City argues that the Court should dismiss Asset Management's takings claim because the City lawfully demolished the McNichols Property under its emergency demolition code to abate a dangerous nuisance.

The Fifth Amendment to the United States Constitution prohibits governments from taking private property "for public use without just compensation," and claims against such unlawful takings may be raised under § 1983.[3] U.S. Const. amend. V; *Chicago, B. & Q.R. Co. v. Chicago,*

---

[2]     Plaintiffs label their claim as an "inverse condemnation" claim "pursuant to the Taking Clause" of the United States and Michigan Constitutions, ECF No. 6, Count I. "A claim of inverse condemnation is 'a cause of action against a governmental defendant to recover the value of property which has been taken ... even though no formal exercise of the power of eminent domain has been attempted by the taking agency.'" *Mays v. Governor of Michigan*, No. 157335, 2020 WL 4360845, at *7 (Mich. July 29, 2020) (quoting *Merkur Steel Supply Inc. v. City of Detroit*, 680 N.W.2d 485, 495 (Mich. Ct. App. 2004)). Asset Management's inverse condemnation claim against the City is encompassed by his taking claim under the Michigan Constitution, Article X, Section 2. *See Biff's Grills, Inc. v. Michigan State Highway Comm'n*, 254 N.W.2d 824, 826 (1977) (recognizing that an inverse condemnation claim is the "means of enforcing the constitutional ban on uncompensated takings of property"); *see also Arkona, LLC v. Cnty. of Cheboygan*, No. 19-CV-12372, 2021 WL 148006, at *9 (E.D. Mich. Jan. 15, 2021) (Ludington, J.) (stating that an inverse condemnation claim and a claim under section two of the Michigan Constitution "do not state distinct causes of action").

[3]     The City argued that Asset Management's claims were untimely because the applicable statute of limitations for claims under 42 U.S.C. § 1983 is three years, and more than three years had elapsed between

---

166 U.S. 226 (1897) (applying the Takings Clause to the states through the Fourteenth Amendment); *Knick v. Twp. of Scott, Pa.*, 588 U.S. 180, 206 (2019) ("A property owner may bring a takings claims under § 1983 upon the taking of his property without just compensation by a local government."). The Michigan constitution contains a similar prohibition, *see* Mich. Const. 1963, art. 10, § 2, and Michigan courts interpret this provision as coextensive with federal law, *Peterman v. State Dep't of Nat. Res.*, 521 N.W.2d 499, 504 n.10 (1994). Land use regulations that result in a permanent, physical invasion of private property amount to a taking within the meaning of the Takings Clause. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441 (1982).

But when the takings power is exercised as part of the government's police power, property owners are not entitled to compensation. *See Ostipow v. Federspiel*, 824 F. App'x 336, 342 (6th Cir. 2020) ("The weight of authority holds that claims emanating from the use of police power are excluded from review under the Takings Clause.") (collecting cases). The Sixth Circuit has acknowledged that demolition of a building to enforce building codes or abate a public nuisance does not constitute a

_____

the demolition of the McNichols Property in February 2020 and the filing of this lawsuit in June 2023. Asset Management responded by pointing out that the statute of limitations was extended by Michigan Governor Gretchen Whitmer's executive order, which tolled the limitations for civil cases in Michigan from March 10, 2020 to June 19, 2020. Upon reflection, the City concurred with Asset Management on this point, and accordingly withdrew its statute of limitations defense.

compensable taking. *Davet v. City of Cleveland*, 456 F.3d 549, 553 (6th Cir. 2000) (district court properly found that the "'[d]emolition, compliant with local law and procedure, in order to enforce building codes or abate a public nuisance does not constitute a taking as contemplated by the federal and [state] Constitutions'"); *Embassy Realty Invs., Inc v. City of Cleveland,* 572 F. App'x 339, 344 (6th Cir. 2014) ("Compensation is not mandated when the state legitimately exercises police power to abate a property nuisance."); *see also In re 106 Walnut, LLC*, 447 F. App'x. 305, 309 (3d Cir. 2011) ("A municipality may, in the exercise of its police power, without compensation destroy a building or structure that is a menace to the public safety or welfare, or require the owner to demolish the dangerous piece of property."). "But the demolition must be 'compliant with local law and procedure,'" which generally "requires proper notice and a valid means of determining the property in fact was a public nuisance." *Cordts v. Griffis*, No. 18-13017, 2020 WL 1274966, at *7 (E.D. Mich. Mar. 16, 2020) (Lawson, J.) (citing *Davet*).

Here, the City argues that Asset Management's takings claim should be dismissed because the City followed the procedures outlined in the City's Code when deeming the McNichols Property a public nuisance requiring emergency demolition. The City first determined that the McNichols Property was a "dangerous property" requiring demolition in 2018 and 2019, and the Detroit City Council approved the demolition of the Property. But the Property was not demolished pursuant to that 2019

22

order. A BSEED inspector conducted an "Emergency Re-Inspection" of the McNichols Property in February 2020, determined that the condition of the Property had worsened and posed an imminent threat and endangered life and thus recommended emergency demolition of the Property pursuant to the City's Code for "Emergency Enforcement" of building codes. That recommendation was supported by photographs of the Property. The Building Official agreed with the inspector and the City posted the required Stay Out notice on the Property. And, although not required by the Emergency Enforcement code provisions, the City mailed a "Notice of Emergency Demolition" to the legal Property owner, Lewis Broomfield. The City did not mail the notice to Asset Management, which did not become the legal Property owner until after the Property had been demolished. The Property was then demolished in late February 2020.

Asset Management agrees with the City that the City is not required to provide compensation for taking property when it legitimately exercises its police power to abate a nuisance. Asset Management also does not challenge the constitutionality of the emergency procedure in Division 4 of the City Code. Asset Management argues instead that there are questions of material fact as to whether the City legitimately used its police power to abate the alleged nuisance in this case. Specifically, Asset Management asserts that the City exercised its police power without notice to Asset Management and failed to

provide it an opportunity to cure. Asset Management states that the corrections orders, blight violation notices, and 2019 non-emergency dangerous building proceeding notices were sent to the McNichols Property address, which the City knew was vacant.[4] In addition, the certified mailings were returned as undelivered. Asset Management states that it therefore had no knowledge of the proceedings to demolish the McNichols Property. Asset Management contends that the City must present evidence demonstrating that emergency demolition was reasonably necessary without giving Asset Management the opportunity to abate the alleged nuisance.

However, that is not what is required by the City Code. The Code does not require notice before demolishing a dangerous building under

---

[4]    Absent from the record is any explanation as to why Asset Management, or its managing member Dwight Dobbins, would fail to provide the City with an accurate and updated mailing address to ensure that it would receive notices from the City, whether pertaining to building safety issues or the payment of taxes. It is less than convincing for a property owner to blame the City for failing to provide notice, when the only mailing address the property owner provided to the City was that of a vacant and partially collapsing structure. "'[W]hen an address has been provided on the relevant document and that document address has not been changed,' the mailing of notice of the [demolition] proceedings to the address provided by the document satisfies due process concerns, even if the municipality might be able to find an updated address upon further investigation." *Sterling Bank & Trust, F.S.B. v. City of Pontiac*, No. 249689, 2005 WL 2016584, at *2 (Mich. Ct. App. Aug. 23, 2005) (quoting *Republic Bank v. Genesee Cnty. Treasurer*, 690 N.W.2d 917, 922  (Mich. 2005)).

its Emergency Enforcement provisions. And "[t]he courts lack the authority to create new notice requirements. The fact that another statutory scheme might appear to have been wiser or would produce fairer results is irrelevant. Arguments based on such policy considerations must be addressed to the Legislature." *Smith v. Cliffs on the Bay Condo. Ass'n,* 617 N.W.2d 536, 541–42 (2000), *abrogated on other grounds in Jones v. Flowers,* 547 U.S. 220 (2006). Moreover, Asset Management has made a takings claim against the City, not a constitutional due process claim.

Here, the City authorized the emergency demolition of the McNichols Property pursuant to Division IV its City Code, "Emergency Enforcement by Building Official and City Departments," on February 4, 2020, following the February 3, 2020 "Emergency Re-Inspection" of the Property. ECF Nos. 16-14, 16-15. That "Notice of Emergency Ordered Demolition" stated that  the McNichols Property "has been inspected" and is "structurally unsound, unsafe, dangerous, is in imminent danger of collapse and poses an actual and immediate threat to the health, safety and welfare of the public" and that "demolition of this structure shall begin immediately." *Id.* The Order further provides, consistent with the City Code, that "the Building Official may demolish the building(s) or structure(s) prior to any requested hearing to protect the health, safety and welfare of the public." *Id.* "An ordinance which represents an exercise of the municipality's police powers is presumed to be constitutionally

valid, with the burden of showing unreasonableness being cast upon those who challenge the ordinance." *Curto v. City of Harper Woods,* 954 F.2d 1237, 1242 (6th Cir.1992).

First, the Court finds that the propriety of the City's prior order to demolish the McNichols Property as a "dangerous property" under Division III of the City Code in 2019, including the notices the City provided Asset Management at that time, has no bearing on the case because it is undisputed that the Property was not demolished pursuant to that 2019 order.

Instead, as the City properly asserts, the McNichols Property was demolished under the Emergency Enforcement provision of the City Code. The City Code leaves the determination of whether an emergency existed on February 3, 2020 completely within the judgment of the Building Official. The emergency provision requires posting a "Stay Out" notice, which was done, but there is no requirement that the City mail either property owners or other interested parties notice that the building is to be demolished, or post such a notice on the building. *See* Detroit City Code §§ 8-17-41 and 8-17-42 (providing for the immediate demolition under Emergency Enforcement provisions "whether or not the procedures that are contained in Division III … have been commenced"). *See Harris v. City of Akron*, 20 F.3d 1396, 1402–05 (6th Cir. 1994) (excusing pre-deprivation process for emergency demolition of decaying home even through the demolition process was "authorized" and

performed under "established procedures"). Nevertheless, the City sent the Notice of Emergency Ordered Demolition to the McNichols Property's legal owner, Lewis Broomfield. Asset Management did not become the legal owner of the Property until March 11, 2020, which was after the Property had been demolished.

Asset Management attempts to create a fact issue regarding the condition of the McNichols Property at the time the City determined that it posed an actual and immediate danger of failure or collapse and endangered life by simply claiming that the photographs "do not accurately depict the condition of the [Property] in early 2020 since the building was secured and debris was not falling from it at the time." Dobbins Decl. ¶ 11, ECF No. 17-2, PageID.302. However, "courts should not accept 'visible fiction' that is 'so utterly discredited by the record that no reasonable jury could have believed' it." *United States v. Hughes,* 606 F.3d 311, 319 (6th Cir.2010) (quoting *Scott v. Harris,* 550 U.S. 372, 379–81 (2007)). Asset Management cannot create a fact issue by simply denying or disputing that which is clearly depicted in the photographs that are part of the record. *See Betson v. Home Depot, U.S.A., Inc.*, No. 17-cv-10485, 2018 WL 5078366, at *3 (E.D. Mich. Oct. 18, 2018) (Leitman, J.) (stating that "because the photos 'blatantly contradict' Betson's claim that the wet mulch was not visible, this Court may 'not adopt' Betson's testimony 'for purposes of ruling on [Home Depot's] motion for summary judgment.'"), *aff'd*, No. 18-2321, 2019 WL 6124888

27

(6th Cir. June 13, 2019); *Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of facts for purposes of ruling on a motion for summary judgment."); *see also Coble v. City of White House, Tenn.*, 634 F.3d 865, 868-69 (6th Cir. 2011) (explaining that while Scott involved a video tape that contradicted the plaintiff's testimony, the decision is not "restricted to cases involving videotapes"); *Womack v. Wal-Mart Stores, Inc.,* 677 F. App'x 296, 297 (6th Cir. 2017) (applying *Scott* in a premises liability case and rejecting portion of plaintiff's testimony that was contradicted by photographic evidence).

Asset Management also cites to an invoice dated March 21, 2019 for "Board up Vacant Building" in support of its claim that the McNichols Property was boarded up when the City issued its emergency demolition order. ECF No. 17-2, PageID.304. However, even assuming that the proffered invoice relates to the McNichols Property, it does not contradict the photographs taken almost one year later, which clearly depict the dilapidated conditions that justified the emergency demolition. Those photographs of the McNichols Property on February 3, 2020 clearly show a deteriorating, unsecured structure with bricks crumbling off its façade onto the ground below, exposed to the elements both through a missing door and open roof, with a large tree visibly growing through that open roof. The Court treats these photographs—reproduced above in this

Order—as accurately depicting the condition of the McNichols Property at the time of the emergency re-inspection on February 3, 2020. The Court therefore finds that the City properly demolished the McNichols Property in accordance with the exercise of its police powers in accordance with the City Code Provisions for emergency demolitions, and that Asset Management's takings claim fails.

The Court also finds, as the City asserts, that Asset Management had actual notice of the emergency demolition before it occurred.[5] Asset Management's principal, Dwight Dobbins, admits that he was informed that there was fencing around the Property in preparation for the demolition on February 25, 2020, which was at least two days before the demolition took place. ECF No. Dobbins Decl. ¶ 13, ECF No. 17-2, PageID.302.[6] *See Keene Grp., Inc. v. City of Cincinnati, Ohio*, 998 F.3d

---

[5]     The City also argues that the City Council's 2019 resolution ordering the demolition of the McNichols property in 2019 provides constructive notice of the City's intention to demolish the Property. *See* City Council 2/26/2019 Resolution, ECF No. 19-2. The City Council found, following a hearing, that the McNichols Property is "in a dangerous condition and should be removed," and thus authorized and directed BSEED "to take the necessary steps for the removal of dangerous structures" at the McNichols Property. *Id.* However, as stated above, the Property was not demolished as a "dangerous property" at that time pursuant to the resolution.

[6]     Asset Management also attaches a "statement" by April Coley in support of its arguments. ECF No. 17-3. However, that statement is neither a notarized, sworn affidavit nor a declaration under penalty of perjury meeting the requirements of 28 U.S.C. § 1746, and thus it is

306, 312–14 (6th Cir. 2021) (dismissing due process claim where "[c]ondemnation proceedings had begun, and Plaintiff knew it."). Asset Management's "11th hour" request to defer the demolition does not save its takings claim because Asset Management has failed to proffer any evidence that it submitted a full and complete application to defer the demolition, and the City never deferred the demolition. The application, in fact, apparently was not filled out until March 4, 2020, after the McNichols Property had been demolished, and the application was still incomplete in any event. ECF No. 17-3, PageID.308. *See Lucaciu v. City of Detroit*, No. 00-73024, 2001 WL 558237, at *1–2 (E.D. Mich. Mar. 26, 2001) (O'Meara, J.) (holding City properly demolished building, even though inspector had prepared a report recommending deferral of the demolition, because the City had not considered whether to grant the deferral and "[t]he Plaintiff never received an order from the City Council changing the status of the property").

Accordingly, the City's motion for summary judgment on Asset Management's inverse condemnation/taking claim will be **GRANTED**, and that claim is **DISMISSED**.

---

inadmissible hearsay that cannot be considered by the Court on this motion for summary judgment. *See Blount v. Stanley Eng'g Fastening*, 55 F.4th 504, 515–16 (6th Cir. 2022) (excluding affidavit that was not a proper declaration under 28 U.S.C. § 1746).

### 2. The City's Counterclaim

In its counterclaim, the City seeks recovery of the costs of the emergency demolition of the McNichols Property pursuant to City Code § 8-17-45, which provides:

> Where any cost incurred by the City in the performance of emergency work is paid by the City upon approval of the Building Official, the Law Department shall institute appropriate legal action against all owners of the building or structure for the recovery of such cost.

The Court finds that the City is entitled to reimbursement for the costs for demolition of the McNichols Property under the City Ordinance. The City has provided undisputed evidence that it incurred $28,800 in demolition costs. ECF No. 16-18. Consequently, the Court **GRANTS** the City's motion for summary judgment on its counterclaim. The Court need not address the City's alternate claims for these costs.

## IV.   CONCLUSION

For the reasons stated above, the City's Motion for Summary Judgment Dismissing Plaintiffs' First Amended Complaint, and for Summary Judgment on the City's Counterclaim is hereby **GRANTED**. Plaintiffs' claims are **DISMISSED WITH PREJUDICE**.

And for the reasons given, the Court further **AWARDS** the City **$14,900** in costs for demolishing the Robson Property and **$28,800** in costs for demolishing the McNichols Property.

This is a final order that closes the case.

**IT IS SO ORDERED.**

Dated: March 28, 2025          /s/Terrence G. Berg
HON. TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE